UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MISCHERAL BOND,

    Plaintiff,

  v.           Case No. 20-CV-361

ANDREW M. SAUL,
Commissioner of the Social Security Administration,

    Defendant.

---

DECISION AND ORDER

---

1. Introduction

  Plaintiff Mischeral Shaunese Bond alleges that she has been disabled since February 14, 2017. (Tr. 13.) She seeks disability insurance benefits. After her application was denied initially (Tr. 74-86) and upon reconsideration (Tr. 87-101), a hearing was held before an administrative law judge (ALJ) on February 27, 2019 (Tr. 32-73). On May 7, 2019, the ALJ issued a written decision concluding that Bond was not disabled. (Tr. 26.) After the Appeals Council denied Bond's request for review (Tr. 1-4), she filed this action. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 4, 6), and the matter is ready for resolution.

## 2. ALJ's Decision

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). The ALJ found that Bond "was not engaged in substantial gainful activity after the alleged onset date." (Tr. 15.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1522(a). The ALJ concluded that Bond has the following severe impairments: "[d]epression, anxiety, and headaches[.]" (Tr. 15.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. § 404.1520(a)(4)(iii), 404.1525. If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month durational requirement, 20 C.F.R. § 404.1509, the claimant is disabled. 20 C.F.R. § 404.1520(d). If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. § 404.1520(e). The ALJ

2

found that Bond "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" (Tr. 16.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite her impairments. 20 C.F.R. § 404.1545(a)(1). In making the RFC finding the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. § 404.1545(a)(2). In other words, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Bond has the RFC

> to perform work at all exertional levels, with no restriction of her ability to lift and/or carry, sit, stand or walk throughout an 8-hour workday. She is not capable of working where she would be exposed to excessive noise or bright, flashing lights exceeding what is generally encountered in an office-type work environment. The claimant is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, and she should avoid concentrated exposure to unguarded hazardous machinery. She can never climb ladders, ropes or scaffolds. The claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. She ought not perform work which requires multitasking. She could perform work requiring an average production pace, but is incapable of significantly above average or highly variable production pace work. She ought not perform work which requires significant self-direction. She is further precluded from work involving direct public service, in person or over the phone, although the claimant can tolerate brief and superficial interaction with the public which is incidental to her primary job duties. She is unable to work in crowded, hectic

3

environments. The claimant can tolerate brief and superficial interaction with supervisors and co-workers, but is not to engage in tandem tasks.

(Tr. 18-19.)

After determining the claimant's RFC the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560. The ALJ concluded that Bond "is unable to perform any past relevant work[.]" (Tr. 24.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c). At this step the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 25.) In reaching that conclusion the ALJ relied on testimony from a vocational expert (VE), who testified that a hypothetical individual of Bond's RFC, age, education, and work experience could perform the requirements of cleaner and laundry worker. (Tr. 25.) Finding Bond could perform work in the national economy, the ALJ concluded she was not disabled. (Tr. 36.)

3. **Standard of Review**

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such

4

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

4. **Analysis**

Bond argues that the ALJ erred by (1) improperly limiting the weight of medical opinions, (2) failing to account for her variable functioning in the RFC assessment, and (3) failing to properly address her medication side effects.

**4.1 Opinion Evidence**

Bond challenges the "little weight" the ALJ afforded to the opinion of treating psychiatrist James Winston, MD, the ALJ's rejection of the degree of limitations stated by treating psychotherapist Christine Hansburg-Hotson, LCSW, and the "little weight" the ALJ gave the opinion of treating physician Gerald Ignace, MD. (ECF No. 11 at 6-15.)

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (unpublished) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)).

While "[a]n ALJ must offer good reasons for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted), courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (citing *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (unpublished)).

**4.1.1. James Winston, MD**

In a medical opinion dated January 15, 2018, Dr. James Winston, Bond's treating psychiatrist, opined that Bond has "[b]ipolar 2, alcohol dependence, generalized anxiety, depressed [sic]" and that she has no useful ability to function in almost all mental abilities and aptitudes needed to do work. (Tr. 501.) Several months later, in an August 2, 2018

6

statement, Dr. Winston opined that Bond has many work preclusive limitations, including that she would miss work due to symptoms or treatment more than four days per month and would need unscheduled breaks six or more times per day. (Tr. 505-10.)

The ALJ gave little weight to Dr. Winston's opinions because they are "not consistent with the evidence as a whole, including Dr. Winston's own records[.]" (Tr. 22.) The ALJ noted that Dr. Winston's medical notes show he saw Bond less often than his medical opinion indicates, and that her generally intact mental status exams do not support such profound limitations. (Tr. 22.) The ALJ "reject[ed] Dr. Winston's opinion as to the degree of limitation," but he did attribute to Bond "a great many limitations with respect to her ability to tolerate stress, concentrate, maintain pace, multitask, and keep up with rapid production pace." (Tr. 22.)

Bond argues that the ALJ erred by interpreting her mental status examinations as "generally intact" without considering her variable functioning or the "abnormalities on exams that detract from his conclusion." (ECF No. 11 at 10.) Bond also argues that Dr. Winston's objective observations that Bond "cannot concentrate," has a "hard time focusing," and is "easily distracted" are frequently noted in his mental status exams and support her self-reported symptoms. (ECF No. 11 at 13; Tr. 507.) Bond contends that the ALJ is incorrect that Dr. Winston misstates the frequency with which he saw Bond—his stated frequency aligns with the frequency of her visits around the time of the opinion. (ECF No. 11 at 9.)

7

The Commissioner argues that it was appropriate for the ALJ to discount Dr. Winston's opinions which were based solely on Bond's subjective allegations. (ECF No. 19 at 15.) He also argues that the record supports the ALJ's statements about the frequency of Dr. Winston's treatment. (ECF No. 19 at 16.)

It was error for the ALJ to discount Dr. Winston's opinions based on the fact that he arguably slightly overstated how often he saw Bond. It is undisputed that Dr. Winston had an established treating relationship with Bond over a period of a couple of years or more in which he saw her regularly. That history provided him with a basis for the opinions he offered.

With regard to the ALJ discounting Dr. Winston's opinion because "the generally intact mental status exams" do not support it, the ALJ failed to address evidence that supports Dr. Winston's opinion, including the numerous objective observations in his treatment notes that corroborate the records of Bond's subjective reports. (Tr. 635-49.) Accordingly, the ALJ has not supported with substantial evidence that part of his opinion that afforded "little weight" to Dr. Winston's opinions.

### 4.1.2. Christine Hansburg-Hotson, LCSW

In a medical opinion dated November 19, 2018, Christine Hansburg-Hotson, Bond's treating therapist, opined that Bond would have many limitations in a full-time job, including the need to lie down 1-2 hours per day, would have weekly verbal and physical outbursts, and would need six or more unscheduled breaks per day. (Tr. 547-

8

51.) The ALJ "reject[ed] the degree of limitations suggested" in Hansburg-Hotson's opinion "for similar reasons as expressed above regarding Dr. Winston." (Tr. 22.)

Bond's argument that the ALJ erred in evaluating Hansburg-Hotson's opinion is intertwined with her argument that he erred in evaluating Dr. Winston's opinion. (ECF No. 11 at 7-14.) The ALJ did not substantially analyze Hansburg-Hotson's opinion separately from Dr. Winston's opinion. (Tr. 22.) As with Dr. Winston's opinion, the court finds that the ALJ has not supported with substantial evidence that part of his opinion that rejected the degree of limitations in Hansburg-Hotson's opinion.

### 4.1.3. Gerald Ignace, MD

In a medical opinion dated February 4, 2019, Dr. Gerald Ignace, MD, Bond's treating primary care doctor, opined that Bond experiences 3-4 headaches per month that typically require her to lie down in a darkened room for 8-10 hours. (Tr. 656.) Dr. Ignace also opined that Bond's headaches at least equal in severity the criteria of Listing 11.03 because they are more frequent than once per week in spite of at least three months of prescribed treatment and have an effect that significantly interferes with Bond's daytime activities. (Tr. 657.)

The ALJ gave little weight to Dr. Ignace's opinion because his treatment notes do not support his finding regarding the need to lay down eight to ten hours. (Tr. 24.) The ALJ also noted that medication helps Bond's headaches, and as a primary care doctor Dr. Ignace is not a headache specialist. (Tr. 24.) The ALJ noted that Dr. Ignace did not observe

9

Bond's headaches but rather relied on her self-reported symptoms to opine that she must spend hours in a dark room to treat them. (Tr. 24.)

Bond argues that the ALJ erred by not crediting Dr. Ignace's testimony that Bond would need to lie down during the workday due to headaches. (ECF No. 11 at 15.) She argues that the ALJ erred by concluding from the fact that Bond's headaches improved with medication that they caused "no limitation" in her ability to work. (ECF No. 11 at 14.) She argues that primary care doctors are better qualified to be familiar with headache symptoms than ALJs and do not need to observe headaches to "opine as to its likely limiting effects." (ECF No. 11 at 14.) She argues that other medical documents corroborate Dr. Ignace's statements about Bond's headaches. (ECF No. 11 at 15.)

The Commissioner responds that the objective evidence, including Dr. Ignace's own treatment notes, does not support the extreme limitations in his opinion. (ECF No. 19 at 17.) He argues that the ALJ reasonably found that Bond could perform a restricted range of work because the medical notes show that medication provided significant relief to her intermittent headaches. (ECF No. 19 at 18.) Bond replies that, even with the improvement noted by the Commissioner, her migraine journal still reflects that she had to lie down due to headaches 3-4 times per month, which is work-preclusive. (ECF No. 20 at 5.)

The court finds that the ALJ reasonably explained why he discounted Dr. Ignace's opinion—it relied largely on Bond's self-reported symptoms. (Tr. 24.) The migraine

10

journal that Bond argues supports Dr. Ignace's opinion is also simply her own reports of her symptoms. The ALJ supported his decision to give little weight to Dr. Ignace's opinion with substantial evidence.

**4.2 Variable Functioning in Residual Functional Capacity**

Bond argues that the ALJ erred in not considering one of her primary impairments in the RFC: bipolar disorder. (ECF No. 11 at 16.) Bond argues that the ALJ ignored mental status exams that show decompensation. (ECF No. 11 at 17.) She argues that the ALJ should have considered whether the positive mental RFC questionnaire report was consistent with the record as a whole in light of the variable nature of mental illness. (ECF No. 11 at 17.) She contends that the ALJ's decision to emphasize her improvement and ignore evidence of her decompensation constitutes legal error. (ECF No 11 at 17.)

The Commissioner responds that the ALJ did acknowledge Bond's fluctuating condition and accounted for it in his RFC. (ECF No. 19 at 8-9.) He argues that the ALJ reasonably described that Bond experienced decreased attention and concentration in January and February 2018 but otherwise had generally normal mental status examinations in 2018. (ECF No. 19 at 8.) He argues that the ALJ's failure to consider Bond's bipolar disorder at step two was harmless because the ALJ properly considered it when determining her RFC. (ECF No. 19 at 11.)

When determining Bond's RFC, the ALJ explicitly discussed the variation in Bond's mental status examinations and the variation in mental status and stability they

11

reflect. (Tr. 21.) In the RFC, the ALJ attributed several limitations to Bond's mental impairments, including:

> The claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. She ought not perform work which requires multitasking. She could perform work requiring an average production pace, but is incapable of significantly above average or highly variable production pace work. She ought not perform work which requires significant self-direction. She is further precluded from work involving direct public service, in person or over the phone, although the claimant can tolerate brief and superficial interaction with the public which is incidental to her primary job duties. She is unable to work in crowded, hectic environments. The claimant can tolerate brief and superficial interaction with supervisors and co-workers, but is not to engage in tandem tasks.

(Tr. 21.) Since the symptoms of Bond's bipolar disorder were accounted for in the RFC, the court finds that the ALJ's failure to consider her bipolar disorder at step two was a harmless error. *Curvin v. Colvin*, 778 F.3d 645, 649-50 (7th Cir. 2015).

### 4.3 Medication Side Effects

Bond argues that the ALJ does not provide enough support for his conclusion that her adverse medication side effects were not a consistent problem because he only cites one treatment note. (ECF No. 20 at 8.) She argues that the adverse side effects of Seroquel were noted four times in the record. (ECF No. 11 at 19.)

The Commissioner responds that the ALJ stated that Bond was not observed to be sleepy or hypoactive when she complained that Seroquel was making her sleepy, and she

12

was not observed to be sleepy or hypoactive at her subsequent appointments. (ECF No. 19 at 9.)

The ALJ cited multiple visits after Bond told Dr. Winston that Seroquel made her sleepy when he did *not* note that she was sleepy or hypoactive. (Tr. 20.) The ALJ inferred from the absence of further documentation of sleepiness that the Seroquel did not continue to affect her in that way. The psychiatry progress notes that the ALJ cites to support his statement that Dr. Winston observed Bond was not sleepy or hypoactive do, however, note that he observed that Bond had "decreased energy" at at least five appointments. (Tr. 636, 641, 647-49.) Although Dr. Winston did not use the exact phrases "sleepy" and "hypoactive," the phrase "decreased energy" is similar. Although the ALJ explained why he concluded Seroquel did not make Bond consistently sleepy, the evidence he cited did not substantially support his conclusion. Accordingly, the ALJ has not supported with substantial evidence that part of his opinion that concluded that this medication side effect was not a consistent problem.

## 5. Conclusion

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 12th day of January, 2021.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge